CHRISTOPHER W. KATZENBACH
(SBN 108006)
Email: ckatzenbach@kkcounsel.com
KATZENBACH LAW OFFICES
912 Lootens Place, 2nd Floor
San Rafael, CA 94901
Telephone: (415) 834-1778
Fax: (415) 834-1842

Attorneys for Plaintiffs AMERICAN AIRLINES
FLOW-THRU PILOTS COALITION,
GREGORY R. CORDES, DRU MARQUARDT,
DOUG POULTON, STEPHAN ROBSON,
and PHILIP VALENTE III on behalf of themselves and all
others similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN AIRLINES FLOW-THRU PILOTS COALITION, GREGORY R. CORDES, DRU MARQUARDT, DOUG POULTON, STEPHAN ROBSON , and PHILIP VALENTE III, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>          vs.<br><br>ALLIED PILOTS ASSOCIATION and AMERICAN AIRLINES, INC.,<br><br>                    Defendants. | Case No.:<br><br>COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR BREACH OF DUTY OF FAIR REPRESENTATION<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**JURISDICTION AND VENUE**

1.     **JURISDICTION.**  This case arises from a breach of the duty of fair representation in connection with the representation of employees in the airline industry under the Railway Labor Act, 45 U.S.C. 151 et seq., an Act regulating

interstate commerce.  This Court has jurisdiction of this case under sections 1331 and 1337 of Title 28 of the United States Code.

2. **VENUE.**    Venue is appropriate in this judicial district pursuant section 1391(b) of the Title 28 of the United States Code as defendant Allied Pilots Association ("APA") is engaged in the representation of employees within this judicial district and defendant American Airlines, Inc. does business within this judicial district.

3. **INTRADISTRICT ASSIGNMENT.**   Under Civil L.R. 3-2(b), assignment is proper in the San Francisco Headquarters or the Oakland division, as is engaged in the representation of employees at the San Francisco Airport.

PARTIES

4. Plaintiff AMERICAN AIRLINES FLOW-THRU PILOTS COALITION (herein "AAFTPC") is a subdivision of the American Eagle Pilots Association, a California Corporation.  AAFTPC is an association of pilots flying for American Airlines who obtained their positions at American Airlines pursuant to the terms of a multi-party agreement, referred to herein as the "Flow-Through Agreement," between (a) American Airlines,  (b) AMR Eagle, Inc., Executive Airlines, Inc., Flagship Airlines, Inc., Simmons Airlines, Inc., and Wings West Airlines, Inc., (jointly referred to herein as "American Eagle"), (c) the Allied Pilots Association (herein "APA") and the Air Line Pilots Association, International (herein "ALPA).  AAFTPC has in excess of 150 members, who are pilots flying for American Airlines and who obtained their employment at American Airlines pursuant to the terms of the Flow-Through Agreement.  The members of AAFTPC are referred to herein as "Flow-Thru Pilots" or "FTPs."  All the Flow-Thru Pilots are represented by the Allied Pilots Association and have suffered discrimination and arbitrary treatment because they are Flow-Thru Pilots, as more fully alleged

1   below.  AAFTPC seeks to act in this action as the representative of the Proposed

2   Class described below.

3          5.      Plaintiffs GREGORY R. CORDES, DRU MARQUARDT, DOUG

4   POULTON, STEPHAN ROBSON, and PHILIP VALENTE III (herein "individual

5   representative plaintiffs") are pilots employed by American Airlines who obtained

6   employment at American Airlines pursuant to the terms of the Flow-Through

7   Agreement and are represented by APA, covered by the collective bargaining

8   agreement negotiated by APA with American Airlines and are on the AA pilot

9   seniority list. The individual representative plaintiffs are members of AAFTPC.

10  The individual representative plaintiffs seek to act in this action as the

11  representatives of the Proposed Class described below.

12         6.      The Flow-Through Agreement was executed on May 5, 1997 and

13  expired in May 2008.   At the time the Flow-Through Agreement was executed,

14  and at material times thereafter, American Airlines and American Eagle were

15  corporations that were majority owned by AMR Corporation (herein "AMR").   On

16  or about December 9, 2013, AMR merged with US Airways Group, Inc.  and the

17  merged entity became known as American Airlines Group, Inc. (herein "AAG").

18  At all times alleged in this Complaint, AMR or AAG controlled labor relations at

19  American Airlines and American Eagle, including the negotiation of collective

20  bargaining agreements and other agreements pertaining to the wages, hours and

21  terms and conditions of employment of pilots employed by American Airlines and

22  American Eagle.

23         7.      Defendant ALLIED PILOTS ASSOCIATION (herein "APA") is an

24  unincorporated labor organization and a representative of employees within the

25  meaning of section 1 Sixth and section 2 of the Railway Labor Act (45 U.S.C. 151

26  Sixth), as made applicable to carriers by air by sections 201 and 202 of the

27  Railway Labor Act (45 U.S.C. 181, 182).

28

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

8.      Defendant AMERICAN AIRLINES, INC. (hereinafter "AA") is a common carrier by air within the meaning of section 1 Sixth of the Railway Labor Act (45 U.S.C. 151 Sixth), as made applicable to carriers by air by sections 201 and 202 of the Railway Labor Act (45 U.S.C. 181, 182).  Defendant AA is a party to a collective bargaining agreement with APA and is joined herein, in part, for purposes of permitting the Court to provide full relief for Plaintiffs on their claims.

## CLASS ACTION ALLEGATIONS

9.      Plaintiffs bring this action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

10.     The Proposed Class is composed of all the airline pilots who are employed by AA and represented by APA and who obtained their employment at American Airlines pursuant to the terms of the Flow-Through Agreement.

11.     The Proposed Class is so numerous that joinder of all its members in a single action is impractical.  There are in excess of 400 pilots who are members of the Proposed Class.

12.     This action presents questions of fact and law that are common to all members of the Proposed Class.

(a)      The Proposed Class is commonly represented by APA pursuant to Certification by the National Mediation Board designating APA as the exclusive representative of the airline pilots employed by AA for purposes of collective bargaining under the Railway Labor Act, as amended.

(b)      The collective bargaining agreement entered into between APA and AA affects each member of the Proposed Class.  The actions of APA and AA which form the subject of this action were directed at all members of the Proposed Class and affect their legal rights in the same or a substantially similar manner.

13.     The claims of the representative plaintiffs are typical of the claims of the Proposed Class.  The individual representative plaintiffs are pilots who

4

obtained employment at American Airlines pursuant to the terms of the Flow-Through Agreement, who are represented by APA and whose terms and conditions of employment are governed by the collective bargaining agreement between APA and AA.  The entity representative AAFTPC is an organization representing the interests of commonly-situated pilots who obtained employment at American Airlines pursuant to the terms of the Flow-Through Agreement, who are represented by APA and whose terms and conditions of employment are governed by the collective bargaining agreement between APA and AA.   The claims of all members of the Proposed Class arose from the same events, from the same unitary course of conduct by APA and AA, and are based on the same legal and remedial theories.

14.     The representative plaintiffs will fairly and adequately protect the interests of the Proposed Class.  The individual representative plaintiffs and AAFTPC have raised funds to support this action, will monitor this action, and will report to the Proposed Class material events occurring in connection with this action.

15.     This action is best maintained as a Class Action because:

(a)     The prosecution of this case as a class action is superior to actions by individuals or groups of individuals because the prosecution of separate actions would create a risk of inconsistent or varying adjudications as to the duty of APA towards the pilots it represents in collective bargaining with AA.

(b)     APA and AA have acted in concert on grounds generally applicable to the Proposed Class.  Declaratory or injunctive relief as to the breach of duty alleged herein would apply to the members of the Proposed Class as a whole.

(c)     The common issues as to the breach of duty alleged herein predominate over questions that affect particular individual members of the Proposed Class.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

# ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Material Terms In Collective Bargaining Agreements.

16.    As material to this case, AA has two forms of seniority:  Occupational seniority (also known as the "occupational date") and Classification seniority (also known as the "classification date").  Occupational seniority is used for determining placement on the Pilot System Seniority list and for bidding purposes. Classification seniority is used to determine pay level and the timing of advancement to succeeding pay levels.

17.    At all times from January 1997 to about January 17, 2018, Section 2.T of the collective bargaining agreements between APA and AA defined furlough as:

> "Furlough" means the removal of a pilot from active duty as a pilot with the Company without prejudice, due to a reduction in force, or the period of time during which such pilot is not in the active employ of the Company as a pilot due to such reduction in force.

18.    At all times from January 1997 to about January 17, 2018, Section 17.V.4 of the collective bargaining agreements between APA and AA provided:

> A pilot furloughed by the Company due to a reduction in force shall continue to accrue seniority during the period of such furlough.  Length of service for pay purposes shall not accrue during such period of furlough.

### B.    Background and Material Terms of the Flow-Through Agreement.

19.    The Flow-Through Agreement arose from disputes between AA and APA over the use of commuter jets by the American Eagle carriers owned by AMR, APA's unsuccessful effort to become the bargaining representative for American Eagle Pilots and APA's desire that all small or regional jet aircraft be flown exclusively by AA pilots represented by APA.  The Flow-Through Agreement provided for employment opportunities at AA for certain American

6

Eagle pilots and provided that AA pilots who were furloughed from jobs at AA could take positions at American Eagle.

20. The Flow-Through Agreement applied to captains flying commuter jets at American Eagle. The Flow-Through Agreement defined a "commuter jet" as an aircraft synonymous with the term "regional jet" that is a turbojet aircraft with at least forty-five passenger seats but not more than seventy seats. The Flow-Through Agreement defined "CJ Captain" as synonymous with the term "RJ Captain" as a captain position on a commuter jet aircraft.

21. Under the terms of the Flow-Through Agreement, AA was required to offer qualified CJ Captains positions in new hire classes at the ratio of one for every two positions in the new hire class. CJ Captains obtained Occupational seniority numbers on the AA pilot seniority list at the time they were offered a position in a new hire training class at AA whether or not they were able to attend such training class. The CJ Captains who obtained such seniority numbers are among the FTPs in this action. If the pilot could not attend the new hire class because of a training freeze or other operational reason, the pilot would have first priority for positions in new hire classes once the training freeze or other operational reason expired. Paragraph III.A, III.B and III.D of the Flow-Through Agreement provided, in material part:

> A. At least one (1) out of every two (2) new hire positions per new hire class at AA will be offered to CJ Captains who are line pilots and who have completed their IOE at AMR Eagle, Inc. Such positions will be offered to the CJ Captains who are line pilots in order of their AMR Eagle, Inc. seniority.

> B. If a CJ Captain is unable to fill a new hire position at AA in accordance with Paragraph III.A. above, due to a training freeze or other operational constraint, (see Paragraph III.J. below), such CJ Captain will be placed on the AA Pilots Seniority List and will count toward the number of new hire positions. The pilot's AA occupational seniority date and number will be

established as if he were able to fill such new hire position at AA and had attended the new hire training class referenced in Paragraph III.A. above.

\*\*\*

D.  If a CJ Captain is placed on the AA Pilots Seniority List per III.B. above, such CJ Captain will receive priority based on his AA seniority in filling a new hire position in the next new hire class, following release from a training freeze or other AMR Eagle, Inc. imposed operational constraint.  Such CJ Captains will not count toward the number of new hire positions offered to CJ Captains at AMR Eagle, Inc., under Paragraph III.A. above.

22.     Under the terms of the Flow-Through Agreement, AA pilots furloughed from AA could take jobs at American Eagle and displace American Eagle CJ captains who were still flying at American Eagle before the American Eagle CJ captain moved to AA.  Paragraph IV.A. of the Flow-Through Agreement provided:

A.  A pilot furloughed from AA may displace a CJ Captain at an AMR Eagle, Inc. carrier provided that the number of CJ Captain positions available to furloughed AA pilots will be limited to the total number of CJ Captain positions at AMR Eagle, Inc. less the number of Eagle Rights CJ Captains.

23.     Under the terms of the Flow-Through Agreement, furloughed AA pilots could not displace an American Eagle pilot who accepted a status as an "Eagle Rights CJ Captain."  Paragraph IV.D. of the Flow-Through Agreement provided:  "Eagle Rights CJ Captains are not subject to displacement by furloughed AA pilots, or any pilot who has been awarded an AA seniority number pursuant to Paragraph III.B. above."

24.     Under the Flow-Through Agreement, an "Eagle Rights CJ Captain" is a CJ Captain at American Eagle who elected to forfeit the opportunity to flow-up to AA.  Paragraph III.F provided:

8

> An AMR Eagle, Inc. pilot may, not later than the completion of IOE for a CJ Captain position or at such time as the pilot is able to demonstrate hardship, elect to forfeit the opportunity to secure a position on the AA Pilots Seniority List as provided by this Supplemental Agreement. Such pilot will hereinafter be referred to as an "Eagle Rights CJ Captain," and will not be eligible for a future new hire position at AA which may otherwise become available under Paragraph III of this Supplemental Agreement. The existence of a hardship for this purpose shall be approved by the ALPA AMR Eagle MEC Chairman and the appropriate management official(s).

25. The Flow-Through Agreement was incorporated into and included as part of the collective bargaining agreements between APA and AA and between ALPA and American Eagle.  It is known as Supplement W to the APA/AA agreement and Letter 3 to the ALPA/American Eagle agreement.

26. The Flow-Through Agreement provided in Paragraph I.C:

> This Supplemental Agreement supplements and makes certain exceptions to the Basic Agreements between the parties. The provisions of the Basic Agreements will continue to apply, except as modified herein and, in the event of a conflict, the provisions herein shall apply.

27. At the time the Flow-Through Agreement was negotiated, and at all times thereafter, the provisions of the collective bargaining agreement between APA and AA alleged in paragraphs 17 and 18 above were in effect.

## C.    The Acquisition of TWA by AA.

28. Prior to September 2001 approximately 513 FTPs had obtained AA Occupational seniority numbers and were on the AA Pilot System Seniority list.

29. Of the FTPs who had obtained AA Occupational seniority numbers, approximately 124 pilots had transferred to AA and begun flying as pilots at AA.

30. The remaining FTPs who had obtained AA Occupational seniority numbers had been held back at American Eagle because of American Eagle's

9

operational needs. These FTPs were prevented from filling positions in new hire training classes when such positions were first offered and available to them. The FTPs withheld at American Eagle continued to staff the airline and allow American Eagle to use the FTPs, who were experienced airline captains, for operations at American Eagle and to recoup AMR's and American Eagle's investment in training these pilots. The withholding of FTPs from transfer to AA was beyond the FTPs' control and was solely for the benefit of AA, AMR and American Eagle.

31. In 2001 AA acquired the assets of TransWorld Airlines (herein "TWA"). An entity known as TWA-LLC was thereafter established to operate TWA's routes. TWA-LLC was a wholly-owned subsidiary of AA operating under its own certification as an airline carrier. Pilots employed by TWA became employees of TWA-LLC.

32. At some point after April 3, 2002, the TWA-LLC pilots were integrated into the AA Pilot System Seniority list and received AA Occupational seniority numbers. Approximately 1067 TWA-LLC pilots were integrated into the AA Pilot System Seniority list interspersed with AA pilots at a ratio of approximately 1:8. The remaining approximately 1225 TWA-LLC pilots were placed at the bottom of the AA Pilot System Seniority list (herein referred to as the "TWA-LLC Staplees").

33. At the time the integration of the TWA-LLC pilots into the AA pilot seniority list, AA was in the process of furloughing AA pilots. Between late 2001 and May 2003, AA placed approximately 1,000 AA pilots on furlough.

34. In addition to the AA pilots placed on furlough, the TWA-LLC Staplees were furloughed from TWA-LLC. Prior to being put on furlough, the TWA-LLC Staplees did not perform any work for AA.

**D.** **APA's Pattern and Practice Favoring Other**
**Pilots Over FTPs, Discriminating Against FTPs,**
**Refusing To Represent The Interests Of FTPs**
**and Acting Arbitrarily Towards FTPs.**

    **1.** **Giving TWA pilots new rights to flow-down and displace**
**Eagle pilots, including FTPs, from their jobs.**

35. As part of the AA-TWA merger, APA and AA initially agreed in November 2001 that the TWA-LLC pilots would not have the ability to flow-down to American Eagle under the provisions of Paragraph IV of the Flow-Through Agreement until pilots already on the AA seniority list before September 2001 were recalled from furlough.   In particular, they had agreed that TWA pilots would not be covered by Paragraph IV of the Flow-Through Agreement until pilot J.K Viele was recalled from furlough.

36. The provisions alleged in paragraph 35 changed the terms of the Flow-Through Agreement by including TWA-LLC pilots among the pilots entitled to flow-down to American Eagle and by including TWA-LLC pilots in such flow-down rights who (a) had never flown for AA, (b) had never been employed by AA, (c) were not furloughed from AA and (d) did not qualify as a "pilot furloughed from AA" under the terms of Paragraph IV.A of the Flow-Through Agreement. This change in terms was materially adverse to the American Eagle pilots by increasing the number of pilots who could flow-down and displace American Eagle pilots.  Prior to negotiating and agreeing to the provisions alleged in paragraph 35, and in particular the extension of flow-down rights right to pilots flying for TWA-LLC, APA and AA did not consult with or get the agreement of ALPA as the representative of American Eagle pilots.

37. Plaintiffs are informed and believe, and thereon allege:  The layoffs of AA pilots between late 2001 and May 2003 (a) made it improbable that pilot J.K.

1  Viele would be recalled at any proximate time to May 2003 and (b) made it

2  improbable that pilot J.K Viele would be recalled before 2005 or later.

3      38.    On May 1, 2003, AA and APA entered into a further agreement to

4  allow the TWA-LLC pilots to flow down to American Eagle.    These revisions are

5  contained in documents signed by AA and accepted by APA known as Letter OO

6  and Letter PP.

7      39.    The agreement to allow the TWA-LLC pilots to flow-down to

8  American Eagle adversely affected the interests of FTPs with AA seniority

9  numbers and other pilots at American Eagle as it (a) allowed TWA-LLC pilots to

10  displace FTPs and other jet captains at American Eagle from positions as aircraft

11  captains before pilot J.K. Viele was recalled and (b) treated all TWA-LLC pilots as

12  if they were furloughed AA pilots regardless whether the TWA-LLC pilot had

13  been employed by AA or was laid off from a position at AA or at TWA-LLC.

14  This agreement abrogated the rights of FTPs (a) that limited flow-downs to AA

15  pilots who were furloughed from active duty at AA due to a reduction in force and

16  (b) included TWA-LLC pilots under the flow-down provisions (i) before pilot J.K

17  Viele would be recalled and (ii) where the TWA-LLC pilots were furloughed from

18  TWA-LLC not AA and did not qualify as furloughed pilots under the definitions of

19  the AA/APA collective bargaining agreement.  This agreement was not submitted

20  for approval by the pilots at American Eagle or by ALPA, the union representing

21  the American Eagle pilots.

22      40.    After this agreement, at least 174 former TWA-LLC pilots flowed-

23  down to American Eagle and displaced pilots at American Eagle.

24      41.    Because of economic and other conditions, after September 2001, AA

25  did not conduct new hire training classes until 2007.  AA began recalling pilots

26  from furlough in January 2007.  The first new hire training class conducted by AA

27  following September 2001 occurred on June 6, 2007.

28

42.    At all times, the number of TWA-LLC pilots with AA pilot seniority numbers obtained as part of the AA-TWA merger has been more than four times the number of FTPs with AA pilot seniority numbers obtained under the Flow-Through Agreement.

43.    APA and AA have regularly and repeatedly acted against the interests of the FTPs as to their terms and conditions of employment at AA.  APA and AA have acted to advance the interests of other pilot groups as to the terms and conditions of employment at AA for these other pilot groups over the interests of the FTPs, contrary to the interests of the FTPs and without taking account of the interests of the FTPs.

### 2.    Favoring TWA-LLC Staplees for new positions at AA when hiring re-started in 2007.

44.    Because of economic and other conditions, after September 2001, AA did not conduct new hire training classes until 2007.  AA began recalling pilots from furlough in January 2007.  The first new hire training class conducted by AA following September 2001 occurred on June 6, 2007.

45.    On May 11, 2007, Arbitrator John B. LaRocco, in Case No. FL0-0903, ruled that the TWA-LLC Staplees were new-hire pilots and their hiring by AA involved hiring for "new hire positions" for purposes of the Flow-Through Agreement and the rights of FTPs to employment at AA for new-hire positions under Paragraph III of the Flow-Through Agreement.  Arbitrator LaRocco's ruling was made pursuant to dispute resolution and arbitration provisions in Paragraph VI of the Flow-Through Agreement.   Both AA and APA were parties to this arbitration.

46.    As a partial remedy for the violations of the Flow-Through Agreement by APA and AA found in Case No. FLO-0903, on October 20, 2008, Arbitrator LaRocco awarded AA Occupational seniority numbers to an additional 154 FTPs who would have obtained AA seniority numbers had they been called for the new-

hire classes that were given to the TWA-LLC Staplees.  These 154 additional AA seniority numbers had an Occupational seniority date of April 30, 2008 and are among the FTPs with Occupational seniority numbers alleged in Paragraphs 34 and 35 hereof.  In awarding these seniority numbers, Arbitrator LaRocco stated: "Because the contract violation occurred while Letter 3/Supplement W was still in effect, the 154 AE pilots shall acquire their AA seniority numbers retroactive to April 30, 2008 so that they are eligible to flow-up to AA as determined by the *Bloch* decision."

47.    On June 30, 2008, Arbitrator Richard I. Bloch, in Case No. FLO-0107, ruled that the right to flow-up is to be retained by Eagle CJ Captains who, prior to May 1, 2008, completed IOE and received AA seniority numbers. Arbitrator Bloch's ruling was made pursuant to dispute resolution and arbitration provisions in Paragraph VI of the Flow-Through Agreement.   Both AA and APA were parties to this arbitration.

48.    The decision by Arbitrator Bloch alleged in Paragraph 47 hereof is the "*Bloch* decision" referred to by Arbitrator LaRocco in the language quoted in Paragraph 46 hereof.

### 3.    Protecting The Advantages TWA-LLC Staplees Received Because Of The Violations Of The FTPs Rights Under The Flow-Through Agreement.

49.    In connection with remedy proceedings arising from arbitration decisions finding that FTPs were entitled to attend AA new hire classes beginning in June 2007 and had been denied such positions, in particular Arbitration No. FLO-0108 before Arbitrator George Nicolau, AA and APA entered into an agreement providing that Arbitrator Nicolau would issue a remedy award that was adverse to the interests of the FTPs who should had been awarded positions ahead of TWA-LLC Staplees who obtained those positions and deprived FTPs of their existing priority in hiring for future positions, including the rights established in

14

1    the decisions of Arbitrator LaRocco and Arbitrator Bloch alleged in Paragraphs 45,

2    46 and 47 hereof.

3        50.    This agreement favored the interests of TWA-LLC Staplees over

4    FTPs.   In particular, APA and AA agreed that (a) only 35 of the 244 FTPs whose

5    rights had been violated would be given priority for positions at AA, (b) 83 TWA-

6    LLC Staplees who had been hired in violation of the Flow-Through Agreement but

7    who had been laid off during the remedy hearings would be allowed to return to

8    AA ahead of the remaining FTPs, (c) 286 FTPs (out of 527 FTPs) would be

9    required to execute an irrevocable choice whether to take a position at AA before

10   any such position was available for them, (d) all future flow-up to AA when new

11   positions became available would be based solely on AA seniority numbers and (e)

12   that no pension years-of-service credits would be given FTPs for the time they

13   were wrongly withheld from positions at AA.

14       51.    In making the agreements alleged in Paragraph 50, APA and AA

15   understood and agreed that these agreements changed the terms of the Flow-

16   Through Agreement and impaired and abrogated the FTPs rights under the Flow-

17   Through Agreement, including (a) subordinating and abrogating the FTPs' rights

18   to jobs they had been denied to the interests of TWA-LLC pilots, (b) changing the

19   future flow-up from the priorities in hiring provided in the Flow-Through

20   Agreement in Paragraphs III.A. and III.D and (c) changing and abrogating the

21   rights of FTPs established in the arbitration decisions alleged in Paragraphs 45, 46

22   and 47 hereof.

23       52.    Section 24.F. of the collective bargaining agreement between APA

24   and AA in effect at the time of the agreements alleged in Paragraphs 50 and 51

25   provided:  "It is understood and agreed that the rights of any pilot covered by this

26   Agreement shall not be abrogated in any way by the provisions of any other labor

27   agreement and no such pilot shall be permitted to accrue rights in abrogation of the

28   terms of this Agreement."

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

53.     The agreements and changes alleged in Paragraphs 50 and 51 were contrary to the provisions of Section 24.F of the collective bargaining agreement between APA and AA because these agreements abrogated the rights of FTPs covered by the APA/AA collective bargaining agreement and permitted the TWA-LLC Staplees to accrue rights to positions at AA contrary to the terms of the Flow-Through Agreement that was a part of the APA/AA collective bargaining agreement as Supplement W.

54.     Plaintiffs are informed and believe, and thereon allege, that APA, AA, American Eagle and ALPA:

a.     Agreed to conceal, and have concealed, the fact that the remedy in FLO-0108 was in fact a negotiated agreement modifying the terms of the Flow-Through Agreement and violating the existing contractual and other rights and career expectations of FTPs.

b.     Agreed to have the arbitrator issue the agreements alleged in Paragraphs 50 and 51 as if these agreements were an arbitration decision by a neutral arbitrator rather than a negotiated agreement in order to obtain favorable and limited judicial review of the terms of these agreements, to avoid claims that APA or ALPA had breached their duty of fair representation and that AA and American Eagle had colluded with or APA and ALPA in such breaches of duty.

55.     On April 9, 2010, Arbitrator Nicolau issued a remedy award in Case No. FLO-0108 that incorporated the terms the parties had agreed upon as alleged in Paragraphs 50 and 51.

56.     In issuing the remedy award alleged in Paragraph 55, Arbitrator Nicolau stated:  "the Award that follows is my Award; it does not represent the 'agreement' of any of the four parties."

57.     The statement by Arbitrator Nicolau alleged in Paragraph 56 was false and was known to be false by Arbitrator Nicolau when he made it and was known to be false by APA and AA when it was made.

16

58.    The statement by Arbitrator Nicolau alleged in Paragraph 56 was intended by Arbitrator Nicolau, APA and AA to be misleading and to allow APA, ALPA and AA to benefit from the limited judicial review applicable to arbitration awards under the RLA, and avoid claims that APA or ALPA breached their duty of fair representation, or APA, ALPA and APA colluded with other parties in such breaches, and to avoid claims that APA, ALPA and AA breached the Flow-Through Agreement or collective bargaining agreements, or colluded with other parties in such breaches.

59.    Plaintiffs are informed and believe, and thereon allege, that APA and ALPA agreed to the terms alleged in Paragraphs 50 and 51, and to the concealment of such agreements as alleged herein, for reasons including: (a) ALPA obtained new benefits for other pilots at American Eagle, at the expense of the interests and rights of the FTPs, that would allow these other pilots a new right to jobs at AA that they no longer had because of the expiration of the Flow-Through Agreement and (b) APA ensured that the TWA-LLC Staplees would be given new positions at AA ahead of FTPs on the AA seniority list that the TWA-LLC Staplees would not have obtained if AA complied with the provisions of Section III of the Flow-Through Agreement and the rights of FTPs established by the arbitration decisions alleged in Paragraphs 45, 46 and 47.

60.    Plaintiffs are informed and believe, and thereon allege, that AA and American Eagle agreed to the terms alleged in Paragraphs 50 and 51, and to the concealment of such agreements as alleged herein, for reasons including: (a) AA avoided a full make-whole remedy for FTPs whose rights under the Flow-Through Agreement had been violated, in particular avoiding compensating FTPs for the pension years-of-service credits that the FTPs would have accrued had they not been wrongfully withheld from positions at AA and (b) American Eagle and AMR kept FTPs flying at American Eagle and avoided or delayed the costs and expenses

incurred in training and other costs that result when senior pilots like the FTPs move to AA.

61.     But for the actions of APA favoring the TWA-LLC Staplees, FTPs would have received positions at AA ahead of the majority of TWA-LLC Staplees. Plaintiffs are informed and believe, and thereon allege that, but for APA's and AA's actions in having TWA-LLC Staplees hired before FTPs starting in 2007 and in negotiating the terms alleged in Paragraphs 50 and 51, (a) all FTPs with AA seniority numbers ahead of the least senior TWA-LLC Staplee would have been working at AA before the end of 2009 and (b) the remaining FTPs with occupational seniority date of April 30, 2008, would have been working at AA on or before the end of 2010.

## 4.     Favoring The TWA pilots In The Equity Distribution Process And Adopting Rules Targeting And Disfavoring FTPs.

62.     Because of modifications to the collective bargaining agreement made as a result of a bankruptcy filing by AA, APA and AA agreed that APA would receive, for distribution to pilots, a part of the equity AA distributed to unsecured creditors after reorganization in bankruptcy.  Thereafter, APA received such an equity distribution from AA.

63.     To distribute the equity received by APA alleged in paragraph 62, APA formed an Equity Distribution Committee ("EDC").

64.     In formulating a plan for equity distribution, the EDC set qualifications and a methodology that (a) excluded FTPs with American seniority numbers who had not yet flowed-up to AA from certain parts of the equity distribution benefits even if they eventually flowed-up to AA before the cut-off date; and (b) excluded FTPs still at American Eagle from all benefits if they did not flow-up before August 1, 2013.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

65.    The August 1, 2013 cut-off date was chosen by APA or the EDC. Plaintiffs are informed and believe, and thereon allege, that this date was adopted because APA or the EDC anticipated that all TWA-LLC pilots would meet this deadline, while the remaining FTPs at American Eagle would not meet this deadline and thereby be excluded from any equity distributions.

66.    The EDC adjusted benefits for TWA-LLC pilots and created a special model for them to increase the TWA-LLC pilots' payout purportedly based on the circumstances under which the TWA-LLC pilots came to American and under principles of general fairness.  APA did not make similar efforts to account for the particular circumstances of FTPs or to make adjustments based on fairness for the FTPs.  The EDC credited TWA-LLC pilots with years of service for pension accrual before the TWA-LLC pilots began flying for American, but credited FTPs with years of service credit only from the point the FTPs began flying for American and notwithstanding the fact that the delay in FTPs moving to American was caused by APA's favoritism of TWA-LLC pilots and violations of the Flow-Through Agreement.

### 5.    Excluding FTPs From Length Of Service Credits Under Letter G.

67.    In connection with the collective bargaining agreement ratified on January 30, 2015, APA agreed with AA to give two additional years of  Length of Service (LOS) credit for pilots on furlough because of lack of work at AA after September 11, 2001.   This agreement was contained in a document known as Letter G.

68.    APA and AA have applied Letter G to give the TWA-LLC Staplees two additional years of LOS credit, notwithstanding that the TWA-LLC Staplees do not and did not meet the definition of furloughed pilots under the APA/AA collective bargaining agreement.  APA and AA have denied Letter G LOS credit

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

for FTPs who had been unable to work at AA during the post-September 2001 period.

69.    At the time of the negotiations for Letter G, APA was aware that the TWA-LLC Staplees would not qualify for this benefit as they were not furloughed from AA, but agreed with AA to give the TWA-LLC Staplees the LOS benefit anyway.

70.    At the time of the negotiations for the two-year LOS credit, APA was aware of the desire of the FTPs for this benefit and decided not to seek to negotiate this benefit for FTPs.

71.    At various times, plaintiffs and the AAFTPC requested that APA take action to seek to rectify or remedy the disparities in pay, LOS credit and other employment conditions at AA affecting the FTPs.  From May 2013 through December 2014, plaintiffs and other FTPs sent at least four letters to the APA's Board of Directors asking for the APA to remedy the pay and benefit disparities adversely impacting the FTPs at AA, including negotiating for LOS credit for the FTPs as APA had negotiated for other pilots coming to AA.   APA did not respond to these letters or provide plaintiffs any explanation or justification for the disparities in pay and benefits suffered by the FTPs.

> **6.    Acting Adversely To The Interests Of FTPs In Seniority Integration And Undermining Interests Of FTPs In The Seniority Integration Process.**

72.    In about 2013, AA purchased the assets of US Airways.  In connection with that purchase, APA and pilot groups from US Airways invoked procedures for a new AA pilot seniority list, referred to as an integrated seniority list or "ISL".  The process of developing a new integrated seniority list is known as "seniority list integration" or "SLI."  The ISL governs hiring, furlough, pay, benefits and employment opportunities at AA.

73.     APA asserted that it would representing the interests of the FTPs in connection with the SLI process and related arbitration and refused to permit the FTPs to participate in the arbitration as an interested party.

74.     Under longstanding practice in seniority list integration arbitrations in the airline industry, longevity of employment is a significant factor for purposes of integrating seniority for the pilots of the merging airlines.  The ISL uses a longevity factor for placement and integration on the ISL.

75.     In connection with the SLI process:  (a) APA has entered into a stipulation that service at regional affiliated airlines (including American Eagle) would not be counted for purposes of longevity in integrating seniority and (b) this stipulation harmed the FTPs disproportionally to any other group of pilots on the proposed integrated seniority list, including by benefitting TWA-LLC Staplees who were hired in 2007 in new hire classes instead of the FTPs.

76.     Plaintiffs requested a copy of the foregoing stipulation referred to in Paragraph 75, but APA refused to provide a copy to plaintiffs.

77.     On or about June 19, 2015, APA submitted a proposed integrated seniority list that harmed the FTPs by moving their seniority positions lower (that is, less senior) on the integrated seniority list by:

> (a)     Putting FTPs in the same tier with the US Airways pilots with the lowest seniority at US Airways by placing all pilots hired post-2007 at the bottom of the integrated seniority list.

> (b)     Putting a group of approximately 755 US Airways pilots ahead of approximately 124 of the FTPs who are the least-senior FTPs on the integrated seniority list.  APA's proposal put the TWA-LLC Staplees ahead of these 755 US Airways pilots on the integrated seniority list.   These 124 FTPs consist of the 154 FTPs remaining in active flying who were awarded AA seniority numbers because of APA's and AA's agreement to

21

hire TWC-LLC Staplees for new hire classes ahead of the FTPs.

(c)    Putting an additional four (4) to five (5) US Airways pilots between each of the remaining FTPs on the proposed seniority list.

78.    No other AA pilots, including TWA-LLC pilots, were adversely affected by the insertions of US Airways pilots alleged in paragraph 77 or the methodology used by APA in developing its proposed integrated seniority list. The use of a post-2007 date, as alleged in Paragraph 77(a), adversely affects FTPs only and, in particular, adversely affects the FTPs who were awarded seniority numbers because of the violations of the Flow-Through Agreement.

79.    APA has assert that the post-2007 date used as alleged in paragraph 77(a) is based on the date new pilots were hired by US Airways after the date the merger of US Airways and America West Airlines was announced in 2005. This was a date new pilots hired by US Airways would have known that their placement on a US Airways seniority list would be affected by the US Airways and America West Airlines merger. This date is generally referred to as the "Constructive Notice Date" and pilots hired after that date are known as "Constructive Notice Pilots."

80.    The explanation given by APA as alleged in paragraph 79 is arbitrary and unreasonable, and a pretext for discrimination against FTPs. In particular:

(a)    The Constructive Notice Date for the US Airways / America West Airlines merger was May 19, 2005. The Constructive Notice Date for the AA/US Airways merger was December 9, 2013.

(b)    The Constructive Notice Date for the US Airways and America West Airlines merger has no relationship to the AA/US

Airways merger, seniority issues for AA pilots or the
Constructive Notice Date for the AA/US Airways merger.

(c)    The Post-2007 date has no relationship to any Constructive
Notice Date or any group of Constructive Notice Pilots.   The
Post-2007 date only has the effect of harming the seniority
position of FTPs and protecting the seniority position of other
AA pilots, in particular the TWA-LLC Staplees.

81.    On June 25, 2015, Plaintiffs asked APA to explain its positions and
the reasons for its positions alleged in Paragraphs 75 and 77.  In response, APA
stated that it had withdrawn its positions.  APA explained, however, that it had not
credited longevity at American Eagle because only mainline longevity has been
credited in previous arbitrations.

82.    The explanation provided by APA that only mainline service should
be credited was arbitrary and unreasonable as:  (a) it did not take into account the
relationship between AA and American Eagle and AMR's control over both
airlines' labor policies, (b) it did not take into account the terms of the Flow-
Through Agreement and the FTPs career expectations arising from the Flow-
Through Agreement and (c) it relied on prior arbitrations that were conducted
under pre-existing union merger policies that had expressly defined what service
could be credited in a way that excluded the service at the regional airlines
involved in those merger situations, whereas the SLI involving AA and USAir was
not conducted pursuant to such pre-existing merger policies or any similar merger
policies.

83.    On or about September 2015, APA and the other participants in the
SLI process submitted revised statements of position as to how the seniority list
should be constructed.  The other participants urged that longevity should be a
factor in the resulting seniority list; APA took the position that longevity should
not be a factor.

23

84.    On October 9, 2015, Plaintiffs requested additional information on APA's position.  In particular, Plaintiffs requested that APA explain the reasons for its change of position.  In addition, Plaintiffs request APA to explain how it intended to address the longevity arguments made by the other participates and whether APA agreed that service at regional carriers should be excluded.  Plaintiffs further noted the evidence that would support including service at American Eagle as longevity for purposes of an integrated seniority list and the concern that APA was listing no witnesses that could address this factual issue.  Plaintiffs again requested a copy of the stipulation on longevity.  Plaintiffs further asked if APA would be presenting evidence to support the FTPs contention that any longevity that might be used should include service at American Eagle and, if not, what is APA's explanation for not presenting such evidence.

85.    APA did not respond to Plaintiffs' letter of October 9, 2015.  Plaintiffs sent a letter to APA on December 21, 2015 asking for a response to the matters stated in the October 9, 2015 letter.   On January 7, 2016, APA responded stating that, because Plaintiffs had brought legal actions against APA, it would not respond to the matters raised in the October 9 or December 21 letters and would not provide the information requested.

86.    The SLI hearings terminated on January 15, 2016.  APA presented no evidence to support using longevity for service at American Eagle in any longevity metric used of the ISL.   Instead, in its post-hearing brief, APA told that arbitrators that only mainline longevity should be used.

87.    Thereafter, the arbitrators issues an ISL that included longevity as a metric but excluded time at American Eagle from longevity.

**E.    APA Negotiates New LOS Credits For All Pilots, Except FTPs.**

88.    On or about January 17, 2018, APA and AA agreed that pilots would have their Length of Service ("LOS") credit for purposes of pay and vacation

accrual include all time pilots were on furlough after September 11, 2001.  APA and AA further agreed to make lump sum payments to pilots who received additional LOS credit because of this agreement.   Plaintiffs are informed and believe, and thereon allege, that the essential terms of this agreement are stated in Exhibit A attached hereto.  This agreement is referred to herein as the "2018 LOS Letter."

89.    Plaintiffs are informed and believe, and thereon allege, that APA and AA agreed that the 2018 LOS Letter and the LOS credits therein described would apply to the following pilots:  (a) Pilots who were flying for AA in AA equipment on September 11, 2001and thereafter furloughed from AA; (b) Pilots who were flying for TWA-LLC on September 11, 2001 and who were thereafter furloughed from TWA-LLC; and (c) Pilots who were flying for US Airways ("US Air") or America West Airlines ("America West") on September 11, 2001 and who were thereafter furloughed from US Air or America West.

90.    APA and AA further agreed in connection with the 2018 LOS Letter that Flow-Through Pilots ("FTPs") would not receive the LOS credits or other payments in the 2018 LOS Letter.

91.    On or about December 30, 2017, in response to information that APA and AA were negotiating for an increase in LOS credit, Plaintiff Cordes wrote to APA inquiring if FTPs would be included or excluded from the proposed increase in LOS credit.   Cordes further requested an explanation if FTPs would be excluded from the increase in LOS credits.  A copy of this communication is attached as Exhibit B.  In response, APA informed Cordes that his correspondence had been forwarded to the APA Negotiating Committee and APA's Legal Department as to who would be included in the LOS credits and was further informed that his concerns would be conveyed to the APA Board of Directors at its meeting on January 3, 2018.   Cordes responded to this communication with further explanation as to the history of discrimination against FTPs.  A copy of

25

1  these communications is attached as Exhibit C.  Thereafter, Cordes received no

2  further response or explanation from APA.

3      92.    On or about January 2, 2018, in response to information that APA and

4  AA were negotiating for an increase in LOS credit, Plaintiff Cordes wrote to AA

5  objecting to any agreement that excluded FTPs from an increase in LOS credits

6  and stating that APA has "not met its obligations to the Flow-Through Pilots over

7  the years" and that "AA cannot leave it up to APA to represent the interests of

8  Flow-Through Pilots where APA has abandoned even a pretext of representing

9  their interest."  A copy of this letter is attached as Exhibit D.  Cordes received no

10 response to his letter from AA.

11     93.    In negotiating the 2018 LOS Letter, APA (a) ignored the interests of

12 the FTPs, (b) failed or refused to represent the interests of FTPs, (c) discriminated

13 against the FTPs and in favor of other pilot groups and (d) acted arbitrarily.

14     a.    APA has been repeatedly informed of the disparities in pay and career

15         advancement suffered by FTPs, but has failed and refused to take any

16         action to correct such disparities or to respond to the concerns in

17         disparities expressed by FTPs or justify APA's actions or the

18         disparities that exist.

19     b.    APA has failed and refused to respond to the FTPs concerns as to the

20         2018 LOS Letter.

21     c.    APA failed and refused to propose in negotiation with AA over the

22         2018 LOS Letter to include FTPs under the terms of the letter or to

23         provide FTPs with restoration of LOS credits they had lost because of

24         the events on September 11, 2001.

25     d.    APA took the position that LOS credits should only be given to pilots

26         who were furloughed after September 11, 2001.  This position was

27         arbitrary for reasons including:

28

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

i.    The benefits provided under the 2018 LOS Letter were given to pilots who were furloughed for reasons other than and independently of the events of September 11, 2001, whereas FTPs, who were unable to take promised positions at AA directly because of the events of September 11, 2001 were denied benefits under the 2018 LOS Letter.

ii.    The benefits provided under the 2018 LOS Letter were given to pilots who suffered no loss of work, including pilots who were allowed to flow-back to American Eagle airlines and displace American Eagle pilots from their jobs at American Eagle, including pilots whose ability to flow-back to American Eagle were negotiated by APA in violation of the terms of the Flow-Through Agreement and without the consent of all parties to the Flow-Through Agreement.

iii.    The injury suffered by FTPs in career advancement and pay classification because of the events of September 11, 2001 was the same or greater than as the loss of career advancement and pay classification incurred by other pilot groups who received benefits under the 2018 LOS Letter and there is no meaningful distinction between the losses suffered by FTPs and the losses suffered by other pilot groups who received benefits pursuant to the 2018 LOS Letter.

94.    APA has taken the actions alleged herein out of hostility towards the FTPs because (a) FTPs came from the regional carrier American Eagle; (b) in flying regional jet aircraft, APA considered and considers FTPs pilots to have taken jobs that belonged to APA-represented pilots at AA; (c) APA is hostile to the rights FTPs acquired under the Flow-Through Agreement and to the placement of the FTPs on the AA Pilot Seniority List the FTPs obtained under the Flow-

27

1    Through Agreement; (d) FTPs have instituted lawsuits challenging APA's actions

2    and its representation of FTPs.

3         95.    Plaintiffs are informed and believe, and thereon allege, that AA

4    agreed to the 2018 LOS Letter (a) to resolve disputes with APA and improve the

5    working relationship with APA, (b) to resolve issues that were important to pilots

6    represented by APA, (c) to resolve issues that adversely affected pilots morale'

7    because they were receiving less pay and had a lower classification than their

8    overall experience in flying jet aircraft would justify, (d) to reward pilots for all

9    their years of experience in flying jet aircraft, and (e) to bring AA pilots to the

10   same career expectation level that pilots at other airlines, including United Air

11   Lines and Delta Air Lines, had achieved based on such pilot's overall years of

12   experience in flying jet aircraft.

13        96.    Plaintiffs are informed and believe, and thereon allege, that, had APA

14   proposed including FTPs under the 2018 LOS Letter, AA would have agreed to

15   include FTPs, for reasons including:  (a) including FTPs would serve to resolve

16   disputes with APA and improve the working relationship with APA, (b) including

17   FTPs would serve to resolve issues that were important to pilots represented by

18   APA, (c) including FTPs would serve to resolve issues that adversely affected

19   pilots' morale because they were receiving less pay and had a lower classification

20   than their overall experience in flying jet aircraft would justify, (d) including FTPs

21   would serve to reward pilots for all their years of experience in flying jet aircraft,

22   and (e) including FTPs would serve to bring AA pilots to the same career

23   expectation level that pilots at other airlines, including United Air Lines and Delta

24   Air Lines, had achieved based on such pilot's overall years of experience in flying

25   jet aircraft.

26        97.    Plaintiffs are informed and believe, and thereon allege, that including

27   FTPs under the terms of the 2018 LOS Letter would not have resulted in a

28   significant cost for AA that would have precluded inclusion of FTPs.

98.    By reason of the actions of APA and AA alleged herein, plaintiffs and other FTPs have lost and will in the future lose pay and benefits, career opportunities and advancement, and will not receive retroactive payments under the 2018 LOS Letter paid to other pilots.

99.    At the time AA agreed to the 2018 LOS Letter, AA was aware of the discrimination by APA against FTPs, was aware that the 2018 LOS Letter continued and exacerbated such discrimination, and was aware that APA was not representing the interests of the FTPs in good faith.   In agreeing to the 2018 LOS Letter, AA acted without regard to or with indifference to the discrimination and bad faith of the APA as to FTPs and APA's violation of its duties.

## FIRST CLAIM FOR RELIEF

### (Breach of Duty of Fair Representation)

100.    Plaintiffs incorporate the allegations in Paragraphs 1 through 99 hereof as if fully set forth herein.

101.    APA has had a duty of fair representation towards the FTPs as to their terms and conditions of employment with AA, including representing the interests of FTPs in negotiation of pay and benefits, including the pay and benefits in the 2018 LOS Letter.

102.    The duty of fair representation required APA to act in good faith toward the FTPs and to refrain from discrimination and arbitrary conduct towards or affecting them.

103.    By the acts alleged herein, APA has acted arbitrarily, discriminatorily and in bad faith towards the FTPs, plaintiffs, the members of plaintiff AAFTPC and the Proposed Class by (a) not proposing to have FTPs included in the benefits in the 2018 LOS Letter, (b) proposing, drafting and/or interpreting the language in the 2018 LOS Letter so that FTPs would be excluded from the benefits in the 2018 LOS Letter and (c) excluding FTPs from the benefits in the 2018 LOS Letter.

29

104.   By the acts alleged herein, APA has breached its duty of fair representation owed to plaintiffs, the members of plaintiff AAFTPC and the Proposed Class.

105.   AA has aided and abetted APA's breach of duty by entering into the 2018 LOS Letter knowing of, or without regard to, APA's breach of duty towards the FTPs.

106.   As a result of APA's actions alleged herein, Plaintiffs, FTPs and the Proposed Class have lost pay and benefits, including retroactive payments.

107.   Monetary damages cannot fully compensate plaintiffs and the Proposed Class for the losses alleged herein and therefore plaintiffs request: (a) a declaration that APA has breached its duty of fair representation owed to the FTPs in connection with the negotiation of the 2018 LOS Letter and (b) an injunction requiring AA to include in the length of service credit for FTPs the time spent at American Eagle following September 11, 2001.

**W H E R E F O R E**, Plaintiffs pray for relief as set forth in the Prayer.

## SECOND CLAIM FOR RELIEF
### (Violation of LMRDA)

108.   Plaintiffs incorporate the allegations in Paragraphs 1 through 99 hereof as if fully set forth herein.

109.   Section 101(a)(4) of the Labor Management Reporting and Disclosure Act ("LMRDA") (29 U.S.C. § 411(a)(4)) provides in part:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator. . ..

30

110.   Section 102 of the Labor Management Reporting and Disclosure Act ("LMRDA") (29 U.S.C. § 412) provides for a civil action by anyone whose rights under Section 101(a)(4) of the LMRDA have been infringed, and provides in part:

> Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

111.   APA negotiated and agreed to the terms of the 2018 LOS Letter and excluding FTPs from the length of service credits and benefits provided in the 2018 LOS Letter in retaliation for Plaintiffs' exercise of their legal right to bring lawsuits and for the purpose, and with the intent, of vexing, injuring and harming FTPs, of preserving the advantages APA had obtained that favored other pilots and of perpetuating the effects of past discrimination against FTPs.  By such action, APA interfered with the rights of Plaintiffs under Section 101(a)(4) of the LMRDA to institute legal actions.

112.   Plaintiffs have suffered damages because of being excluded from the benefits under the 2018 LOS Letter.

113.    APA has acted with malice towards Plaintiffs and FTPs and Plaintiffs are entitled to punitive and exemplary damages against APA.

114.   Monetary damages cannot fully compensate plaintiffs and the Proposed Class for the losses alleged herein and therefore plaintiffs request: (a) a declaration that APA violated Section 101(a)(4) of the LMRDA in negotiating and agreeing to the 2018 LOS Letter and (b) an injunction requiring APA to seek agreement with AA to include in the length of service credit for FTPs the time spent at American Eagle following September 11, 2001.

**W H E R E F O R E**, Plaintiffs pray for relief as set forth in the Prayer.

///

///

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**PRAYER**

**W H E R E F O R E**, Plaintiffs pray for relief as follows:

1.      As to the 2018 LOS Letter, for an order certifying the action as a class action, appointing plaintiffs as Class Representatives and their counsel as attorneys for the Class;

2.      For damages, as alleged hereinabove;

3.      For (a) a declaration that APA has breached its duty of fair representation owed to the FTPs in connection with negotiating and agreeing to the 2018 LOS Letter and (b) a declaration that APA violated Section 101(a)(4) of the LMRDA in negotiating and agreeing to the 2018 LOS Letter.

4.      For (a) an injunction requiring APA to seek agreement with AA to include in the length of service credit for FTPs the time spent at American Eagle following September 11, 2001, and (b) an injunction requiring AA to include in the length of service credit for FTPs the time spent at American Eagle following September 11, 2001.

5.      For attorneys' fees incurred in establishing the breaches of duty by APA and attempting to mitigate the harms caused by APA's breach of duty.

6.      Plaintiffs' costs of suit and reasonable attorney fees.

7.      Such other and further relief the Court may deem appropriate on the evidence presented.

Dated:  June 20, 2018.              KATZENBACH LAW OFFICES

By     s/ Christopher W. Katzenbach
      _____
      Christopher W. Katzenbach
      Attorneys for Plaintiffs AMERICAN AIRLINES
      FLOW-THRU PILOTS COALITION, Et Al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues and claims for relief in this action.

Dated: June 20, 2018.                    KATZENBACH LAW OFFICES

By  s/ Christopher W. Katzenbach
_____
      Christopher W. Katzenbach
   Attorneys for Plaintiffs AMERICAN AIRLINES
   FLOW-THRU PILOTS COALITION, Et Al.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF